OFFICES OF

**PAVONE &**  **FONNER, LLP**

A LAW PARTNERSHIP

**BENJAMIN PAVONE, ESQ.**
**STATE BAR NUMBER 181826**
600 WEST BROADWAY, SUITE 700
SAN DIEGO, CALIFORNIA  92101
TELEPHONE: 619 224 8885
FACSIMILE: 619 224 8886
EMAIL: bpavone@cox.net

ATTORNEYS FOR ANTONIO GUTIERREZ

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO GUTIERREZ, JR,<br><br>        PLAINTIFF,<br>v.<br><br>MARGARITA SANDOVAL,<br>Registered Nurse,<br><br>        DEFENDANT. | CASE NO.: 1:20-cv-01130-AWI-EPG (PC)<br><br>**GUTIERREZ'S SUPPLEMENTAL BRIEF IN OPPOSITION TO SANDOVAL MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, SUMMARY ADJUDICATION OF ISSUES**<br><br>**Date:** May 12, 2023<br>**Time**: 10:00 a.m.<br>**Dept.**: 10, 6th Floor<br>**Judge**: Hon. Erica P. Grosjean |

---

# **TABLE OF CONTENTS**

I.   THE COURT SHOULD PERMIT THE THIRD AMENDED COMPLAINT, PURSUANT TO THE COMPANION MOTION, BECAUSE DISCRETION TO PERMIT AN AMENDMENT IS TIPPED BY ITS VIABILITY. ....................................................9

   A.   For Situations with a Mixture of Factors Cutting Both Ways, and Absent Substantial Prejudice, Courts Decide Rule 15 Questions by Allowing Viable Amendments and Disallowing Non-Viable Ones. ............9

II.  GUTIERREZ POSSESSES A VIABLE EIGHTH AMENDMENT CLAIM AGAINST DR. MONTEGRANDE BECAUSE SHE REFUSED TO ENGAGE WITH MULTIPLE MEDICAL PROCESSES ..............................................12

   A.   Introduction ..............................................................................12

   B.   General Standards for Eighth Amendment Claims .......................................12

   C.   A Catalog of Montegrande's Errors, including Two Separate Failures to Engage a Multi-Step Protocol Necessary to Provide Medically Accurate Health Care, Reveals a Profound Deviation from Accepted Standards. ....................................................13

      1.   Failure to Enter a Narrative Progress Note on Saturday, August 19, 2019 ...........................................13

      2.   Despite Being Prompted to Behave in Conformity with Medical Requirements, Montegrande's Retroactive Progress Note on August 28, 2019 Was Seriously Deficient. ..............................14

      3.   Dr. Montegrande Fails to Engage with the Multi-Step Process Necessary to Arrive at a Proper Pharmacological Regimen for Gutierrez ..............................................................15

      4.   Dr. Montegrande Failed to Install a Monitoring Program. ...................18

   D.   The Totality of Montegrande's Care Reflects Deliberate Indifference because, Apart from Individual Mistakes, Montegrande Failed to Engage Two Entire Requisite Medical Processes. ..........................................19

      1.   Profound Deviation from Accepted Medical Standards .........................20

      2.   Abdication of a Doctor's Medical Responsibilities ...............................22

      3.   The Selection of Medrol Based on "Cost or Convenience" ..................23

III. GUTIERREZ IS ENTITLED TO A JURY'S DETERMINATION OF COMPENSATORY DAMAGES; IF IT FINDS LIABILITY BUT AWARDS $0, NOMINAL DAMAGES MUST BE AWARDED. .............................23

    A.  *Conn* Theory – Constant Monitoring Observation. ............................................23

    B.  Entitlement to Jury Determination of Compensatory Damages ......................25

    C.  Nominal Damages ...........................................................................................26

CONCLUSION ............................................................................................................26

# **TABLE OF AUTHORITIES**

## **_Cases_**

_Armbruster v. Shah_
　2019 U.S. Dist. Lexis 151375,
　2019 WL 5874335 (S.D. Ill. 2019) ...................................................23

_Bess v. Campbell_
　2013 U.S. Dist. Lexis 103109 (C.D. Cal. 2013) .........................21

_Brandon v. Smith_
　2007 U.S. Dist. Lexis 109632 (C.D. Ill. 2007) ..........................22

_Burke v. Regalado_
　935 F.3d 960 (10th Cir.  2019) ....................................................22

_Canton v. Harris_
　489 U.S. 378 (1989)........................................................................22

_Coleman v. Quaker Oats_
　232 F.3d 1271 (9th Cir. 2000) .................................................. 9-11

_Clement v. Gomez_
　298 F.3d 898 (9th Cir. 2002)........................................................21

_Cook v. Overall_
　2017 U.S. Dist. Lexis 29753,
　2017 WL 819549 (S.D. Ill. 2017). ................................................13

_Connick v. Thompson_
　563 U.S. 51 (2011). ........................................................................22

_De'Lonta v. Johnson_
　708 F.3d 520 (4th Cir. 2013)........................................................22

_Desertrain v. Los Angeles_
　754 F.3d 1147 (9th Cir. 2014) .................................................. 9-10

_Duckworth v. Ahmad_
　532 F.3d 675 (7th Cir. 2008). ......................................................20

_Edmo v. Corizon_
　935 F.3d 757 (9th Cir. 2019)........................................................22

*Eres v. Alameda*
    1999 U.S. Dist. Lexis 1385
    1999 WL 66519 (N.D. Cal. Feb. 1, 1999)..................................................................20

*Estate of Cole*
    94 F.3d 254 (7th Cir. 1996)........................................................................................20

*Estelle v. Gamble*
    429 U.S. 97 (1976) .............................................................................................12, 21

*Farmer v. Brennan*
    511 U.S. 825 (1994)....................................................................................................12

*Fleming v. Lind-Waldock*
    922 F.2d 20 (1st Cir. 1990) ........................................................................................11

*Flowers v. Toon*
    2023 U.S. Dist. Lexis 113518
    2023 WL 4306236 (E.D. Cal. 2023)...........................................................................12

*George v. Sonoma County*
    732 F.Supp.2d 922 (N.D. Cal. 2010) .........................................................................20

*Gruber v. Gedney*
    2018 U.S. Dist. Lexis 137439 (D. Nev. 2018).............................................................13

*Helling v. McKinney*
    509 U.S. 25 (1993) ......................................................................................................21

*Hongsathavij v. Queen of Angels*
    62 Cal.App.4th 1123 (1998)........................................................................................22

*Huggins v. Longs Drug*
    16 Cal.App.4th 1215 (1992)........................................................................................15

*Jackson v. Hayakawa*
    605 F.2d 1121 (9th Cir. 1979).....................................................................................10

*Jett v. Penner*
    439 F.3d 1091 (9th Cir. 2006) ....................................................................................21

*Johnson v. Lockhart*
    941 F.2d 705 (8th Cir. 1991).......................................................................................22

*Josey v. Hollingsworth*
    996 F.2d 632 (3d Cir. 1993)........................................................................................11

*Lemire v. CDCR*
　　726 F.3d 1062 (9th Cir. 2013) ..................................................................12

*Lozano v. Santa Clara*
　　2019 U.S. Dist. Lexis 216013,
　　2019 WL 6841215 (N.D. Cal. 2019) ..........................................................20

*Mata v. Saiz*
　　427 F.3d 745 (10th Cir.  2005) ..................................................................22

*McGowan v. Hulick*
　　612 F.3d 636 (7th Cir. 2010). ...................................................................23

*Norfleet v. Webster*
　　439 F.3d 392 (7th Cir. 2006)......................................................................20

*Lopez v. Smith*
　　203 F.3d 1122 (9th Cir. 2000) ..................................................................22

*Payton v. Weaver*
　　131 Cal.App.3d 38 (1982) .........................................................................22

*Paugh v. Uintah County*
　　47 F.4th 1139 (10th Cir. 2022) .................................................................22

*Petties v. Carter*
　　836 F.3d 722 (7th Cir. 2016) .....................................................................13

*Puckett v. Barrios*
　　2023 U.S. Dist. Lexis 27363,
　　2023 WL 2088353 (E.D. Cal. 2023) ..........................................................12

*Rosenblit v. Zimmerman*
　　166 N.J. 391, 766 A.2d 749 (2001) ...........................................................21

*Satterwhite v. Dy*
　　2013 U.S. Dist. Lexis 9178 (W.D. Wash 2013) .........................................23

*Vann v. Vandenbrook*
　　596 F.Supp.2d 1238 (W.D. Wisc. 2009) ....................................................20

*Youngberg v. Romeo*
　　457 U.S. 307 (1982) ..................................................................................20

*Waln v. Dysart*
　　54 F.4th 1152 (9th Cir. 2022) ...................................................................13

*Wasco v. Southwall*
  435 F.3d 989 (9th Cir. 2006) ................................................................... 9-10

*Wilson v. Seiter*
  501 U.S. 294 (1991) ...................................................................................... 12

**<u>Statutes & Other Authority</u>**

Berg, T. & Jonsson, L. "*Are Patients with Bell's Palsy Receiving
  the Right Treatment?*" Tidsskriftet Den Norske Legeforening,
  Vol. 135 (2015) ..............................................................................................17

CACI Jury Instructions

  No. 509 .............................................................................................................22

Edersheim, Judith, *et al., "Liability Associated with Prescribing
  Medications,"* Prim Care Companion J Clin Psychiatry 115
  No. 11(3) (2009) ..................................................................................... 17-18

Engstrom, M, *et al.* "*Prednisolone and valacyclovir in Bell's palsy:
  a randomized, double-blind, placebo-controlled, multicenter
  trial*," Lancet Neurol, Vol. 7, No. 11 ........................................................17

Greco, A., et al. "*Bell's Palsy and Autoimmunity,*" Autoimmunity
  Reviews, Vol. 12, No. 2 (2012) ............................................................ 16-17

Grogan, P.M. & Gronseth, G.S. "*Practice parameter: Steroids, acyclovir,
  and surgery for Bell's palsy (an evidence-based review)*," Neurology,
  Vol. 56, No. 7 (2001) .............................................................................. 16-17

Gutheil, Thomas, "*Fundamentals of Medical Record Documentation*,"
  Psychiatry (Nov. 2004) ...............................................................................13

Madhok, V., "*Corticosteroids for Bell's palsy (idiopathic facial
  paralysis)*," National Library of Medicine, Cochrane Library,
  website: https://www.ncbi.nlm.nih.gov (2016) .................................. 15-16

Murthy, J.M.K. & Saxena, Amrit B. "*Bell's palsy: Treatment Guidelines,*"
  Annals of Indian Academy of Neurology, Vol. 14 (Suppl. 1),
  S71 (2011) ........................................................................................................17

New Jersey Statutes Annotated

  Section 2C:28-6(1) .........................................................................................21

Taylor, Danette C., Medscape, *"Bell's Palsy Treatment & Management"*
    Website: https://www.medscape.com (captured July 12, 2022) .............................17

Tiemstra, J.D. & Khatkhate, N. *"Bell's Palsy: Diagnosis and*
    *Management,"* American Family Physician, Vol. 76,
    No. 7 (2007) ........................................................................................................16

Van de Graaf, Robert, and Nicolai, Jean-Philippe, *"Bell's palsy before*
    *Bell: Cornelis Stalpart van der Wiel's observation of Bell's palsy*
    *in 1683,"* Otol Neurotol, National Library of Medicine,
    website: https://pubmed.ncbi.nlm.nih.gov (2005) .......................................16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**I.**

**THE COURT SHOULD PERMIT THE THIRD AMENDED COMPLAINT, PURSUANT TO THE COMPANION MOTION, BECAUSE DISCRETION TO PERMIT AN AMENDMENT IS TIPPED BY ITS VIABILITY.**

In the Court's supplemental briefing order, it effectively posed the question: which cases should it follow among disparate Ninth Circuit decisions as to whether a plaintiff should be permitted leave to amend his complaint to belatedly include a theory, or cause of action, omitted by the existing complaint, but raised as a basis to resist summary judgment?

In support of such permission, the Court cited *Desertrain*,[1] and for the contrary view, it cited *Wasco* and *Coleman*.[2]  After a perusal of the case law, the answer appears to require the Court to first ask and answer a different question.  That question is: does the Court believe that the plaintiff has a viable claim to enforce if it permits the amendment?

The uniting factor of the case law is not a strict analysis of the applicable factors; a factor analysis is inherently just an appeal to the Court's discretionary judgment.  That discretion, it seems, is most informed by whether permitting the extra litigation is productive.  Accordingly, after proving up this deduction from the case law, Gutierrez focuses on addressing whether his proposal to add Montegrande on an Eighth Amendment basis is a worthy endeavor.

**A.    For Situations with a Mixture of Factors Cutting Both Ways, and Absent Substantial Prejudice, Courts Decide Rule 15 Questions by Allowing Viable Amendments and Disallowing Non-Viable Ones.**

The Court's citations to *Desertrain*, *Wasco,* and *Coleman* identify a five-factor analysis addressed to the subject of whether leave to amend should be permitted.  To review that analysis, Gutierrez directs the Court to his (pending) motion for leave to

---

[1]  Dkt. 94:2, *citing Desertrain v. Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014).
[2]  Dkt. 94:2, *citing Wasco v. Southwall,* 435 F.3d 989, 992 (9th Cir. 2006) *and Coleman v. Quaker Oats*, 232 F.3d 1271, 1292, 1294 (9th Cir. 2000).

amend filed on July 28, 2023.[3]

However, as noted above, discretion seems to be consistently exercised in favor of permitting the previously unformalized theory, if the court feels it is a valid argument. Thus, in *Desertrain*, the plaintiff was permitted to amend even with a pending MSJ, in the context of the Ninth Circuit's contemporaneous conclusion that the belatedly-disclosed theory, a constitutional vagueness argument, was in fact valid.[4]

There, in interpreting whether a municipal code prohibiting the use of a vehicle for "living quarters," without defining the term, and without specifics as to how long a person could park without it being regarded as "overnight, day-by-day, *or otherwise*," the Ninth Circuit was sympathetic to the homeless plaintiff's confusion about what was legal and what was not.[5]

In *Jackson v. Hayakawa*, the Ninth Circuit felt that students at San Francisco State were entitled to the benefit of an earlier related case's conclusion that discipline in connection with a student demonstration was unwarranted when founded merely on a police report; the Court overlooked "inartful pleading" in favor of considering this fair point on summary judgment.[6]

In contrast, when the courts do not feel the amending party has presented a valid new claim, discretion is typically exercised to preclude it.  This occurred in *Wasco*, where the Ninth Circuit could not get on board with the plaintiff's idea that two companies involved in the manufacture of a certain glass panel *conspired together* to conceal the fact that the panels did not perform as advertised; accordingly, it rejected plaintiff's request to consider this concept for the first time on summary judgment.[7]

In *Coleman v. Quaker Oats*, the tenor of the court's opinion reveals that it did not

---

[3]  Dkt. 95.
[4]  *Desertrain v. Los Angeles*, 754 F.3d 1147, 1155 (9th Cir. 2014).
[5]  *Desertrain,* 1155.
[6]  *Jackson v. Hayakawa*, 605 F.2d 1121, 1128-1129 (9th Cir. 1979).
[7]  *Wasco v. Southwall*, 435 F.3d 989, 990, 992 (9th Cir. 2006).

believe that Quaker Oats, a big company with a sophisticated employee rating system, terminated three employees based on a company-wide practice of age discrimination. Rather, a review of each employee's situation, in the context of difficult company-wide lay-off decisions, revealed specific reasons for each decision.[8]  Consequently, upon a request seeking to include a disparate impact claim first raised in opposition to summary judgment, the Ninth Circuit said no.[9]

The same result occurred in *Josey v. Hollingsworth*, where the Court was skeptical that there was disparate impact racial discrimination based on the Black plaintiff's new argument that such discrimination occurred merely because he was not one of the employees to which the founders originally sold the company.[10]  There were 12 other Caucasian employees, senior to the plaintiff, who also were not approached as potential purchasers.  Consequently, the Third Circuit, while entertaining the possibility that there might be some individualized racism toward the plaintiff for more recent events, did not feel that the original sale a decade earlier in 1982 was controversial; as such, it declined to permit a disparate impact theory first raised in opposition to summary judgment.[11]

And yet again, the First Circuit in *Fleming v. Lind-Waldock* was not convinced that a plaintiff could allege actual wrongdoing by an investment house beyond the fact of losses in one of its account, which was controlled not by the house but by an outside crook, and thus declined to permit an amendment on MSJ.[12]

Consequently, it appears that the Court's discretion will likely be tipped one way or the other by its assessment as to whether Gutierrez can make out a successful case for Eighth Amendment deliberate indifference against Montegrande.

---

[8]    *Coleman v. Quaker Oats*, 232 F.3d 1271, 1282-1286 (9th Cir. 2000).
[9]    *Coleman,* 1292.
[10]   *Josey v. Hollingsworth*, 996 F.2d 632, 641-642 (3d Cir. 1993).
[11]   *Josey,* 641-642.
[12]   *Fleming v. Lind-Waldock*, 922 F.2d 20, 22-24 (1st Cir. 1990).

**II.**

## GUTIERREZ POSSESSES A VIABLE EIGHTH AMENDMENT CLAIM AGAINST DR. MONTEGRANDE BECAUSE SHE REFUSED TO ENGAGE WITH MULTIPLE MEDICAL PROCESSES.

### A. Introduction

At first glance, Montegrande's dosage mistake appears to merely be one of, at most, medical malpractice: she did order a steroid in methyprednisolone, but she failed to increase the dosage associated with its utilization in the Medrol Dosepak to ensure that Gutierrez ingested sufficient prednisone (technically, cortisol) to be effective.

Again, at first blush, this seems like a garden-variety professional mistake and not the kind of "deliberate indifference to the risk of serious harm" associated with the Eighth Amendment's cruel-and-unusual standard.[13]

But upon closer examination, and in conjunction with her decisions to tamper with the medical record, what emerges is a cascade of mistakes and ultimately a recognition that Montegrande abandoned *two entire processes* of applicable medical management in this situation.  This makes for a viable deliberate indifference claim under several Eighth Amendment doctrines.

### B. General Standards for Eighth Amendment Claims

The formulation for a violation of the Eighth Amendment in the medical context begins with *Estelle v. Gamble*, in which the US Supreme Court articulated the "deliberate indifference to serious medical needs" standard.[14]  Today, that means officials were subjectively aware of a serious risk to the inmate's health, ignored it, and that the risk was objectively serious.[15]  A plausible Eighth Amendment claim requires

---

[13]  *Flowers v. Toon*, 2023 U.S. Dist. Lexis 113518, *11, 2023 WL 4306236 (E.D. Cal. 2023); *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

[14]  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

[15]  *Lemire v. CDCR*, 726 F.3d 1062, 1074 (9th Cir. 2013); *Puckett v. Barrios*, 2023 U.S. Dist. Lexis 27363, *5-6, 2023 WL 2088353 (E.D. Cal. 2023), *citing Farmer v. Brennan*, 511 U.S. 825, 834 (1994) and *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

more than a "sheer possibility" that the doctor violated the Eighth Amendment.[16]  In assessing the matter, courts review the "totality" of an inmate's care.[17]

### C.  A Catalog of Montegrande's Errors, including Two Separate Failures to Engage a Multi-Step Protocol Necessary to Provide Medically Accurate Health Care, Reveals a Profound Deviation from Accepted Standards.

Dr. Montegrande committed two entire sets of professional violations, as well as individual mistakes, during and after her August 19, 2019 evaluation of Gutierrez.  These are itemized below.

### 1.  Failure to Enter a Narrative Progress Note on Saturday, August 19, 2019

Montegrande declined to enter a medical progress note on August 19, 2019, by omitting to memorialize that she had seen Gutierrez on that date, had diagnosed him with Bell's palsy, and that she had ordered certain medication.[18]

As explained by Gutierrez's expert:

> One of the purposes of the medical record is to serve as a communication tool between all healthcare providers. The most important purpose of the medical record is to provide accurate communication between healthcare providers to ensure patient safety. Assuring the continuity of care requires accurate records of the care provided to achieve the patients' goals. Multidisciplinary teams rely almost solely on the medical record to communicate between team members.[19]

---

[16]  *Waln v. Dysart*, 54 F.4th 1152, 1164 (9th Cir. 2022).

[17]  *Cook v. Overall*, 2017 U.S. Dist. Lexis 29753, *12, 2017 WL 819549 (S.D. Ill. 2017), citing *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (courts must look at "the totality of an inmate's medical care" when deciding deliberate indifference); *Gruber v. Gedney*, 2018 U.S. Dist. Lexis 137439, *24 (D. Nev. 2018) (a plaintiff may provide other evidence, in that case other admissions by the physician, beyond the specific treatment decision to establish deliberate indifference).

[18]  Dkt. 81-4, p. 2 (pdf 5/316).

[19]  Dkt. 81-3, p. 17 (pdf. 20/387); Gutheil, Thomas, "*Fundamentals of Medical Record Documentation*," Psychiatry (Nov. 2004) ("failure to document relevant data is itself considered a significant breach of and deviation from the standard of care").

The apparent reason for Montegrande's unwillingness to enter a progress note reflects clear deliberate indifference to Gutierrez and his medical care: to conceal that she thought that Nurse Sandoval, and derivatively CCI medical, failed to prescribe Gutierrez the appropriate medication within 24 hours and were thus potentially responsible for his adverse outcome.[20]

This was a particularly egregious decision because the Sandoval encounter on August 17, 2019 established the exact date and time that Gutierrez's symptoms began, triggering the start of the critical 72-hour countdown, after which – if a Bell's patient does not receive the necessary medication – permanent paralysis becomes a significant risk.[21]  Given that Montegrande only saw Gutierrez once, half-way through the 72-hour window, leaving a comprehensive medical record was of particular importance.[22]

On August 19, 2019, Montegrande should have made a comprehensive narrative record that included the events of August 17, 2019 and August 19, 2019.  She elected to do neither.

### 2.  Despite Being Prompted to Behave in Conformity with Medical Requirements, Montegrande's Retroactive Progress Note on August 28, 2019 Was Seriously Deficient.

On August 26, 2019, PLO issued a letter to CCHCS raising concerns about Gutierrez's care, including that Montegrande did not enter a progress note on August 19, 2019.[23]  PLO (like a subsequent physician) could not determine whether Gutierrez had been prescribed the requisite steroid or anti-viral.  Two days after PLO's letter, on August 28, 2019, Montegrande entered a retroactive progress note, by this time nine days after the actual date of treatment, confirming that she ordered Medrol and

---

[20]  Dkt. 81-2, Exhibit 14:63 therein [pdf p. 137/466]; Dkt. 81-2, Exhibit 11:2 therein [pdf p. 39/466].

[21]  Dkt. 81-4, p. 14 [pdf p. 17/316].

[22]  Dkt. 81-3, p. 17 [pdf p. 20/387].

[23]  Dkt. 81-2, Exhibit 4:2 therein [pdf. p. 21/466].

Acyclovir.[24]

But Montegrande once again engaged in concealment, in two ways: first by again concealing the existence of Gutierrez's encounter with Sandoval on August 17, 2019, and second by concealing the detail about the pharmacological program she had initiated on August 19, 2019.[25]  Thus, even when faced with outside pressure to behave appropriately, Montegrande once again elected to conceal critical facts and thereby subordinate Gutierrez's medical interest in proper medical care to her own interests and/or Sandoval's and CCI's in avoiding responsibility for mistakes.

### 3.   Dr. Montegrande Fails to Engage with the Multi-Step Process Necessary to Arrive at a Proper Pharmacological Regimen for Gutierrez

This brings us to the medication decision itself.  By way of background, Dr. Montegrande became a doctor in June 1980.[26]  At the time she was treating Gutierrez in 2019, she has been a medical practitioner for over 39 years.  There is no possibility that she did not understand the obligation to not only prescribe correct medication, but to prescribe it in the correct dose.[27]

In this case, that decision required a multi-step process.  While the effectiveness of corticosteroids was debated between the 1970's and the 1990's, the debate was apparently settled by the early 2000's.[28]  The accepted steroid for treatment of Bell's palsy is high-dose prednisone.[29]  Given that it can be easily determined that this is the

---

[24]   Dkt. 81-2, Exhibit 11:2 therein [pdf p. 39/466].

[25]   Dkt. 81-2, Exhibit 5 therein [pdf p. 21/466].

[26]   BLP, ¶ 2, Exhibit 2.

[27]   *See, e.g.*, *Huggins v. Longs Drug*, 16 Cal.App.4th 1215, 1227 (1992) (the appropriate dosage to be administered is "just as important" as providing the correct medication).

[28]   Madhok, V., "*Corticosteroids for Bell's palsy (idiopathic facial paralysis),*" National Library of Medicine, Cochrane Library, website: https://www.ncbi.nlm.nih.gov (2016).

[29]   Dkt. 81-4:13 (pdf. 16/316) ("Dr. Montegrande failed to prescribe the usual regimen of high-dose corticosteroid known to be effective in treating Bell's palsy. Physicians

treatment for Bell's palsy, she apparently made no inquiries, and performed no research, to determine accurate medical protocol.

If standard high-dose prednisone is not prescribed, at a minimum a series of explanatory steps is necessary to connect the different medical regime to an appropriate course of pharmacological treatment.

On both August 19, 2019 and August 28, 2019, Dr. Montegrande instead decided to:

> (1)    Not explain (nor document the explanation) as to why she declined to prescribe the standard corticosteroid for Bell's palsy, high-dose prednisone.  It is not as if Bell's palsy is a new ailment.  It was first detected in 1683.[30] High-dose prednisone has been the recognized medication protocol for over 20 years.[31]

---

in the United States ordinarily treat Bell's with high-dose prednisone"); Tiemstra, J.D. & Khatkhate, N. "*Bell's Palsy: Diagnosis and Management,*" American Family Physician, Vol. 76, No. 7, p. 1000 (2007); Greco, A., et al. "*Bell's Palsy and Autoimmunity,*" Autoimmunity Reviews, Vol. 12, No. 2, p. 326 (2012); Madhok, V.B., *et al.*, "*Corticosteroids for Bell's palsy (idiopathic facial paralysis),*" Cochrane Database of Systematic Reviews, Vol. 7, No. 7, p. 2, p. 14 (2016) (reference to the number of landmark studies in which prednisone was the favored corticosteroid, followed by prednisolone).

[30]    Van de Graaf, Robert, and Nicolai, Jean-Philippe, "*Bell's palsy before Bell: Cornelis Stalpart van der Wiel's observation of Bell's palsy in 1683,*" Otol Neurotol, National Library of Medicine, website: https://pubmed.ncbi.nlm.nih.gov (2005).

[31]    Madhok, V., *et al.* "*Corticosteroids for Bell's palsy (idiopathic facial paralysis),*" National Library of Medicine, Cochrane Library, website: https://www.ncbi.nlm.nih.gov (2016) ("The treatment of Bell's palsy used to be highly controversial. Corticosteroids were the treatment of choice, based mainly on non-randomised comparisons (Adour 1972). The authors of numerous clinical series both espoused and condemned corticosteroid therapy with, what appeared to them, equally convincing arguments (Burgess 1984). Four systematic reviews found a significant trend favouring corticosteroid treatment in improving the recovery of facial motor function (de Almeida 2009; Grogan 2001; Ramsey 2000; Williamson 1996)").

(2)   Not determine (nor document the determination of) the accurate dosage of prednisone Gutierrez should ingest to secure an effective response, which requires a calculation based on his weight.[32]

(3)   Not explain (nor document the explanation) why she selected methylprednisolone as a substitute for prednisone.[33]

(4)   Not explain (nor document the explanation) why she selected the Medrol Dosepak, which did not contain the correct dosage, as the way in which she would provide the correct, adjusted quantity of methylprednisolone to Gutierrez.[34]

---

[32]   Almost every available research paper, and almost all popular publications and websites, offer the same basic recommendations and ratios: patients should be given one milligram of prednisone for every one kilogram (or 2.2 pounds) of body weight, not exceeding 60 mgs, for a total of six or seven days, followed by a three or four-day taper (with the dosage dropping about 10 mg per day). Greco, A., *et al. "Bell's Palsy and Autoimmunity,"* Autoimmunity Reviews, Vol. 12, No. 2, p. 326 (2012); Grogan, P.M. & Gronseth, G.S. "*Practice parameter: Steroids, acyclovir, and surgery for Bell's palsy (an evidence-based review)*," Neurology, Vol. 56, No. 7, pp. 2-3 (2001); Berg, T. & Jonsson, L. "*Are Patients with Bell's Palsy Receiving the Right Treatment?*" Tidsskriftet Den Norske Legeforening, Vol. 135, p. 1026 (2015); Taylor, Danette C., Medscape, "*Bell's Palsy Treatment & Management*" Website: https://www.medscape.com (captured July 12, 2022); Engstrom, M, *et al.* "*Prednisolone and valacyclovir in Bell's palsy: a randomized, double-blind, placebo-controlled, multicenter trial,*" Lancet Neurol, Vol. 7, No. 11, p. 994 (2008); Murthy, J.M.K. & Saxena, Amrit B. "*Bell's palsy: Treatment Guidelines,*" Annals of Indian Academy of Neurology, Vol. 14 (Suppl. 1), S71 (2011).

[33]   Dkt. 81-2, Exhibit 5 (pdf p. 23/466); *see also* Edersheim, Judith, *et al.,"Liability Associated with Prescribing Medications,"* Prim Care Companion J Clin Psychiatry 115, 116, No. 11(3) (2009) (to avoid malpractice "[i]n the area of prescribing medications, this means choosing a medication tailored to the clinical needs of each patient (*e.g.*, to minimize adverse side effects and adverse interactions with other medications or conditions)").

[34]   Edersheim, Judith, *et al.,"Liability Associated with Prescribing Medications,"* Prim Care Companion J Clin Psychiatry 115, 117, No. 11(3) (2009) ("Proper documentation of clinical interactions is critical in the defense of a malpractice claim. Physicians must document what service was provided, must document when

(5)    And, not create a progress note that reflects the ingestion instructions given to Gutierrez.[35]

Given that Gutierrez weighed about 173 pounds,[36] he presumptively required the maximum 60 mg dose of prednisone.  Given a 5:4 ratio between methylprednisolone and prednisone, when Antonio only took six 4 mg tablets of Medrol on Day 1, as per the Medrol Dosepak, he was effectively only consuming the equivalent of 30 mgs of prednisone.  This represents one-half of the amount of prednisone he should have been taking on day one.  Medrol is prescribed for many medical problems; as such, custom tailoring its dosage to the ailment in question is particularly important.

The medical literature recommends consuming 60 mgs of prednisone for a full week (and only then shifting to a three-day or longer taper), but the Medrol Dosepak begins tapering immediately, such that, in total, Gutierrez only ingested about 1/4 the recommended amount of prednisone.

In summary, it is one thing to make a mistake in a particular decision, for example by making a math error or accidentally selecting the wrong medication box among two that look similar; it is quite another *to evade the entire process necessary to arrive at a correct pharmacological regimen.*

### 4.    Dr. Montegrande Failed to Install a Monitoring Program.

The instructions for use of Medrol expressly caution doctors that "constant monitoring" is needed in regard to its application, for the reason that "dosage requirements are variable and must be individualized on the basis of the disease under treatment and the response of the patient."[37]

---

and by whom it was provided, and must document the medications prescribed, including the dose, directions, and number of refills provided.")

[35]    Edersheim, Judith, *et al., "Liability Associated with Prescribing Medications,"* Prim Care Companion J Clin Psychiatry 115, 117, No. 11(3) (2009).

[36]    BLP, ¶ 1, Exhibit 2.

[37]    Dkt. 81-2, Exhibit 27:10 (pdf p. 459/466).

Thus, when Dr. Montegrande ordered Medrol, a generic drug, for Gutierrez, she skipped the entire secondary discipline of monitoring his response.  Because the prescription was ordered at hour 36 of the 72-hour window, and provided to him at hour 40, the next 32 hours were critical in terms of making sure that the correct amount of steroid was ingested and that the presumptive dosage was creating an effective response. The Medrol instructions are clear: "The initial dosage should be maintained or adjusted until a satisfactory response is noted.  If after a reasonable period of time there is a lack of satisfactory clinical response, Medrol should be discontinued and the patient transferred to other appropriate therapy."[38]

Once again, Dr. Montegrande evaded *the entire process* by which a monitoring protocol should have been determined, installed, and monitored, in the critical, remaining 32-hour window.  Had effective monitoring been implemented, there is an excellent chance a secondary health care provider, especially if she were a physician, might have noticed that Gutierrez was taking the wrong drug in the wrong dosage – or was not responding to Medrol for a reason specific to his body – and either switched him to prednisone, increased the Medrol dosage to an effective level in time to interrupt the palsy, or otherwise adapted the medication program.

But because Dr. Montegrande did not engage the concept of monitoring Gutierrez in any way, he was not seen again until August 23, 2019, six days after the onset of symptoms and a good three days after the 72-hour window closed.  In other words, he was not seen even once in the 32 hours that followed his meeting with Montegrande – the last 32 hours in which a detection of the dosage error might have permitted an effective correction.

### D. The Totality of Montegrande's Care Reflects Deliberate Indifference because, Apart from Individual Mistakes, Montegrande Failed to Engage Two Entire Requisite Medical Processes.

Gutierrez tenders three theories by which Montegrande might be held to account

---

[38]  Dkt. 81-2, Exhibit 27:10 (pdf p. 459/466).

under the Eighth Amendment: (1) authority that permits liability based on a decisions that are "so far afield from accepted medical practice" that an inference of deliberate indifference may be made; (2) abdication of one's medical duty sufficient to also permit an inference of deliberate indifference; (3) that Montegrande's decision to order Medrol constitutes an "easier and less efficacious treatment based on cost or convenience."

As to all theories, the case against Montegrande is anchored by the fact that when she saw Gutierrez on Monday, August 19, 2019, she knew he was experiencing a serious neurological problem, one that required specific treatment, because she told him that his facial paralysis condition might be permanent due to the failure to get him medication within 24 hours.[39]

### 1.   Profound Deviation from Accepted Medical Standards

A physician's decisions may be "so far afield of accepted professional standards" as to raise an inference of deliberate indifference.[40]  Such deviation may include a failure to respond to a known medical problem, a failure to provide a system of ready access to adequate medical care, or a failure to provide competent medical staff to address the problem.[41]

In this case, a permissible inference of deliberate indifference may be drawn by

---

[39]   Dkt. 81-2, p. 63 [pdf. p. 137/466]; Dkt. 81-2, Exhibit 11:2 (pdf. 39/466).
[40]   *Lozano v. Santa Clara*, 2019 U.S. Dist. Lexis 216013, *49, 2019 WL 6841215 (N.D. Cal. 2019), *citing George v. Sonoma County*, 732 F.Supp.2d 922, 937 (N.D. Cal. 2010); *Vann v. Vandenbrook*, 596 F.Supp.2d 1238, 1243 (W.D. Wisc. 2009); *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008), *citing Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006), *in turn citing Estate of Cole*, 94 F.3d 254, 262 (7th Cir. 1996).  *Cole*, in turn, cited a 1982 Supreme Court decision with much the same language, in a slightly different context. *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982) (establishing standard of care for a mentally incompetent person as "a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment").
[41]   *Eres v. Alameda*, 1999 U.S. Dist. Lexis 1385, 1999 WL 66519, *8 (N.D. Cal. Feb. 1, 1999).

the conjunction of four dynamics: (1) Montegrande's multiple mistakes in terms of her fundamental duty to document a patient's file accurately and completely; (2) the apparent explanation for that omission, in terms of concealing Sandoval and CCI's earlier medical malpractice, which itself represents a compelling basis to criticize Montegrande's mental state;[42] (3) her complete failure to engage the multi-step process of arriving at a correct pharmacological regimen, resulting in another series of mistakes; (4) the complete failure to engage the process of a proper (10-day) monitoring program to ensure that the proper medication was accurately received and ingested by the patient, and that there was timely monitoring of the patient's response, especially in the remaining 32-hour window, with a mind open to making adjustments if the treatment regimen was not working.

It is no answer for Montegrande to argue that she provided Gutierrez with "some medication" by virtue of arranging for the Medrol Dosepak:

> The provision of some medical treatment ... does not immunize officials from the Eighth Amendment's requirements. [Citations.]  As the Fourth Circuit has aptly analogized, imagine that prison officials prescribe a painkiller to an inmate who has suffered a serious injury from a fall, but that the inmate's symptoms, despite the medication, persist to the point that he now, by all objective measure, requires evaluation for surgery. Would prison officials then be free to deny him consideration for surgery, immunized

---

[42] *Bess v. Campbell*, 2013 U.S. Dist. Lexis 103109, *23 (C.D. Cal. 2013), *citing Helling v. McKinney*, 509 U.S. 25, 32-33 (1993) *and Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) ("Deliberate indifference may also be shown by a prison official's attitude and conduct in response to a prisoner's serious medical needs"); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (deliberate indifference may be shown "by the way in which prison physicians provide medical care"); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (a "sufficiently culpable state of mind" permits an inference of deliberate indifference); *compare Rosenblit v. Zimmerman*, 166 N.J. 391, 401, 766 A.2d 749, 754 (2001) *citing* N.J.S.A. 2C:28-6(1) (making it a crime in New Jersey to alters, destroy, or conceal any article, object, record, or document in order to impair a later proceeding).

from constitutional suit by the fact they were giving him a painkiller? We think not.[43]

In summary, in taking the combination of these dynamics together – and a tally of a dozen mistakes – Montegrande's failure of compliance with basic medical protocol, even considering some effort to get Gutierrez steroid medication, nevertheless still permits an inference that she was deliberately indifferent to his care.

## 2. Abdication of a Doctor's Medical Responsibilities

Montegrande's decisions might also be processed under case law that permits an inference of deliberate indifference based on abdication of a physician's duties.[44] Along similar lines, patient abandonment is a recognized tort in California.[45]

In this case, after Montegrande prescribed Gutierrez the Medrol Dosepak, she abandoned him. She did not arrange for him to see her again, she did not see him again, she did not arrange for monitoring during the final 32 hours of the critical 72-hour

---

[43] *Edmo v. Corizon*, 935 F.3d 757, 793 (9th Cir. 2019), *citing Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (en banc) (explaining that "[a] prisoner need not prove that he was completely denied medical care" to make out an Eighth Amendment claim) *and De'Lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("[J]ust because [officials] have provided De'Lonta with some treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with constitutionally adequate treatment.")

[44] *Paugh v. Uintah County*, 47 F.4th 1139, 1163 (10th Cir. 2022), *citing Burke v. Regalado*, 935 F.3d 960, 994 (10th Cir. 2019) *and Mata v. Saiz*, 427 F.3d 745, 758 (10th Cir. 2005); *Brandon v. Smith*, 2007 U.S. Dist. Lexis 109632, *9 (C.D. Ill. 2007), *citing Johnson v. Lockhart*, 941 F.2d 705, 707 (8th Cir. 1991) (abdication of policy-making and oversight responsibilities can reach the level of deliberate indifference); *compare Connick v. Thompson*, 563 U.S. 51, 61 (2011) (a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may constitute deliberate indifference); *Canton v. Harris*, 489 U.S. 378, 395 (1989) (a "policy of inaction" to not train employees to assist detainees in medical distress might qualify as deliberate indifference).

[45] CACI 509; *Payton v. Weaver*, 131 Cal.App.3d 38, 45 (1982); *Hongsathavij v. Queen of Angels*, 62 Cal.App.4th 1123, 1138 (1998).

window, and he was not monitored in that window.  He was not seen until six days later, by a nurse, when his outcome was effectively permanent.

This abandonment by Montegrande not only cemented the fact that Gutierrez would only ingest a quarter of the amount of steroid he needed, but foreclosed any chance that these mistakes could be timely detected and corrected.

### 3.   The Selection of Medrol Based on "Cost or Convenience."

Finally, given that Medrol is applicable to a wide variety of ailments, and would be expected to be stocked in every medical institution, it is plausible that Montegrande chose it because it was what was readily available, rather than studying whether it was appropriate.  Such a decision would also support a finding of deliberate indifference.[46]

Regardless of the legal theory, Montegrande's refusal to engage in multiple medical processes, along with concealment evidence that speaks to her mindset, reflects that Gutierrez possesses a viable Eighth Amendment case.

### III.
### GUTIERREZ IS ENTITLED TO A JURY'S DETERMINATION OF COMPENSATORY DAMAGES; IF IT FINDS LIABILITY BUT AWARDS $0, NOMINAL DAMAGES MUST BE AWARDED.

In its July 12, 2023 order, the Court also asked the parties to brief the question of what part, if any, of the Eighth Amendment claim would proceed if Plaintiff cannot show that his long-term prognosis was adversely affected by the delay in treatment.[47]

### A.   *Conn* Theory – Constant Monitoring Observation.

As a preliminary observation, consideration of nominal damages necessarily rejects Plaintiff's causation analogy to *Conn v. Reno*'s "set in motion" language, in a

---

[46]   *Satterwhite v. Dy*, 2013 U.S. Dist. Lexis 9178, *36 (W.D. Wash 2013), *citing McGowan v. Hulick*, 612 F.3d 636, 641 (7th Cir. 2010); *Armbruster v. Shah*, 2019 U.S. Dist. Lexis 151375, *40, 2019 WL 5874335 (S.D. Ill. 2019) (deliberate indifference may occur when a doctor "chooses an easier and less efficacious treatment" based on cost or convenience rather than medical judgment).

[47]   Dkt. 94:2:27.

case where Montegrande did *not* successfully treat the patient.[48]  In other words, if Montegrande had prescribed the correct medication and Gutierrez had healed as a result, it could be comfortably observed that Sandoval's delay in treatment had little or no impact on his outcome (apart from the 40 hours, addressed below).

But because Montegrande also failed him, and Gutierrez suffered a permanent injury, he sincerely feels that Sandoval's conduct is most aptly characterized as a joint or contributing tortfeasor within the *Conn* body of case law.[49]

This is because Sandoval delayed his care by 36 hours, one-half of the critical life-saving 72-hour window, and thereby played a material role in the combination of circumstances that led to Gutierrez not getting proper medication and suffering permanent nerve damage.  This is underscored not just by evidence of the 36-hour delay itself, but by admonitions contained in the medication's instructional insert that a patient taking the drug requires "constant monitoring."[50]

In other words, if Sandoval had done her job on August 17, 2019 by, one way or the other, arranging for monitoring per the Medrol manufacturer's admonition (*viz*, a standard of care for usage of the chosen drug), even if Montegrande had botched the dosage as she did, it is more probable than not that the error still would have been detected in the applicable 72-hour window.  Viewed this way, Sandoval's mistakes are a contributing causative agent for the adverse outcome, even given Montegrande's error. If nothing more, surely this issue is for a jury to decide.

---

[48]  *Conn v. Reno*, 591 F.3d 1081, 1098-1099 (9th Cir. 2010).

[49]  *Hazle v. Crofoot*, 727 F.3d 983, 994 (9th Cir. 2013) ("In *Crowe v. Cnty. of San Diego*, for example, we found police officers to be the proximate cause of a *Miranda* violation, even though they did not commit the ultimate act that completed the constitutional violation. 608 F.3d 406, 430-31 (9th Cir. 2010). We held that liability for a constitutional violation requires only that the defendant 'set[] in motion a series of acts by others which the [defendant] knows'").

[50]  Dkt. 81-2, Exhibit 27:10 (pdf p. 459/466).

### B.  Entitlement to Jury Determination of Compensatory Damages

Assuming the Court rejects this argument, Gutierrez is still entitled for a jury to evaluate whether he suffered compensable economic damages by virtue of the 40-hour delay.  For simplicity's sake, let us assume that Montegrande had performed her job correctly by securing proper medication, such that Gutierrez's symptoms had abated promptly upon her intervention.  Because Sandoval did not do her job, Gutierrez nevertheless suffered 40 extra hours of misery.  He certainly suffered pain and discomfort in that interval – his face was literally undergoing a paralysis event – to various parts of his head and neck.[51]  Two days of pain and discomfort may not be the most high-value compensatory event, but it is surely a non-nominal one.[52]  A jury should decide the precise figure.[53]

---

[51]  Dkt. 81-2, Exhibit 14:28, 29, 36, 47 (pdf pp. 102-103, 110, 121/466); see also; Dkt. 81-2, Exhibit 2:1 (pdf p. 12/466) (seeking compensation for "pain and suffering" on August 21, 2019 for the "nurse[']s dereliction of duty," four days after Sandoval's care misdiagnosis August 17, 2019).

[52]  *Williams v. Oakland*, 915 F.Supp. 1074, 1077 (N.D. Cal. 1996) (validating pain and suffering as the "very heart" of a 1983 action); Amador v. Baca, 299 F.R.D. 618, 632 (C.D. Cal. 2014) (actual injury includes economic loss, damage to his reputation, or emotional distress); *compare Henriquez v. ALDI*., 2023 U.S. Dist. Lexis 30225, *15 (C.D. Cal. 2023) (purchase of a $.75 tuna can based on false advertising regarded as a "concrete" injury); *Toliver v. Olmsted*, 2014 U.S. Dist. Lexis 152281, *4-5, 2014 WL 5465106 (S.D. Ill. 2014) (reflecting reports of "constant," "unbearable" and "intolerable" pain associated with Bell's palsy condition); *see Ramos v. Shah*, 293 A.D.2d 459, 460, 740 N.Y.S.2d 376, 377 (N.Y. App. 2002) ($450,000 compensatory award for several days of dehydration-related misery between malpractice event and death).

[53]  *Smith v. Wade*, 461 U.S. 30, 52 (1983) ("Compensatory damages . . . are mandatory; once liability is found, the jury is required to award compensatory damages in an amount appropriate to compensate the plaintiff for his loss.")

### C.  Nominal Damages

Apart from these scenarios, even if a jury returned a $0 damage figure by accepting the defense claim that Montegrande's dosage mistake was a complete causation defense for Sandoval, an award of nominal damages would be mandatory.[54]

### CONCLUSION

The Court should deny Sandoval summary judgment because her errors set events in motion that resulted in Gutierrez not timely receiving medication, not just by failing to diagnose him, but even if she had, not arranging for monitoring as directed.

The Court should also deny summary judgment in order to permit the inclusion of Defendant Montegrande, because she made a cascade of mistakes by ignoring two entire processes for medical management, which, along with her tampering with the medical record, is sufficient to permit an inference of deliberate indifference.

Even if the Court considered granting Sandoval summary adjudication based on causation, it should nevertheless decline to summarily adjudicate damages, as Gutierrez is entitled to compensatory or nominal damages.


Respectfully,


Dated: August 2, 2023                    PAVONE & FONNER, LLP


                                          Benjamin Pavone, Esq.
                                          Attorneys for Antonio Gutierrez

---

[54] *Uzuegbunam v. Preczewski*, – U.S. – , – 141 S.Ct. 792, 800-802, 209 L.Ed.2d 94 (2021); *Carey v. Piphus*, 435 U.S. 247, 266 (1978); *Hazle v. Crofoot*, 727 F.3d 983, 994 (9th Cir. 2013); *Floyd v. Laws*, 929 F.2d 1390, 1402-1403 (9th Cir. 1991).